UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

Darlene Torres,                                         :

                                                        :

                                Plaintiff,              :

                -against-                               :

                                                        :

Commissioner of Social Security,                        :

                                                        :

                                Defendant.              :

------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED:__12/30/2022__

**OPINION AND ORDER**

21-CV-1957 (KHP)

**KATHARINE H. PARKER, United States Magistrate Judge**

Plaintiff Darlene Torres ("Plaintiff"), currently represented by counsel, commenced this action against Defendant, Commissioner of the Social Security Administration ("Defendant"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of the Defendant's decision that her minor child, C.K.C., was not disabled under the Act from August 27, 2016, the alleged onset date, through the date of the decision, June 29, 2020.  On October 5, 2022, both parties moved for judgment on the pleadings.  (ECF No. 26.)  For the reasons set forth below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

## BACKGROUND

C.K.C., born on October 5, 2010, suffers from autism spectrum disorder ("ASD"), attention deficit hyperactivity disorder ("ADHD"), and anxiety disorder.  He also has several impairments the ALJ found were not severe including Baker's cyst, low weight/BMI, and heart murmur.  (A.R. 12.)  At the time of the June 19, 2019 ALJ hearing, he was attending third grade.  (A.R. 25.)

1. **Procedural History**

On March 12, 2018, Plaintiff filed an application for child Supplemental Security Income

("SSI") benefits on behalf of C.K.C.  (A.R. 11.)  The application was denied at the initial level on

May 25, 2018.  Plaintiff then requested a hearing, which was held over a year later on June 19,

2019 before Administrative Law Judge ("ALJ") John Carlton.  (A.R. 8-10, 39.)  Both Plaintiff and

C.K.C. appeared and testified at the hearing.  On June 29, 2020, over a year after the hearing,

the ALJ issued a decision finding that C.K.C. had severe mental impairments but was not

disabled as defined under the Act.  (A.R. 8-27.)  The decision became final on January 4, 2021,

when the Appeals Council denied Plaintiff's request for review.  (A.R. 1-5.)

Plaintiff, initially proceeding *pro se*, commenced this action on March 5, 2021,

contending that: (1) the ALJ failed to develop the record by obtaining medical source

statements from treating physicians and a functional assessment from claimant's school

teacher; (2) the ALJ improperly misconstrued the evidence and ignored evidence; and (3) the

ALJ failed to address medical equivalence.  (*See* Compl.; ECF No. 2.)  Plaintiff subsequently

retained counsel on May 3, 2022.  (ECF No. 18.)  The parties submitted a joint stipulation in lieu

of Motion for Judgment on the Pleadings.  (ECF No. 26.)

2. **Summary of the Administrative Record and Hearing**

    a.  *Treating Physician History*

In October 2017, C.K.C. saw Dr. Allison Gault, his primary care doctor, with reports that

he was distracted and fidgety at home.  (A.R. 260.)  He was 49.41 inches tall, weighed 47

pounds and 6.4 ounces, and had a BMI of 13.65.  Dr. Gault observed C.K.C. to be cooperative

with no acute distress and well developed and nourished.  (A.R. 261.)  She did not report any

2

abnormal findings.  (A.R. 262.)  Dr. Gault noted that the family is concerned about ADHD and that Plaintiff would book intake for a mental health evaluation.

On December 14, 2017, C.K.C. went to the Northside Center for Child Development ("Northside") for a psychiatric evaluation. (A.R. 223.)  Plaintiff reported that C.K.C. is hyperactive, impulsive, constantly jumping around, has difficulty completing tasks, and spins around excessively.  (*Id.*)  Plaintiff also informed Northside that C.K.C. hits his siblings, has anxiety and a sensory processing disorder, and exhibits intense anger frequently.  (*Id.*)  Dr. Gerard Salomon, who examined C.K.C, noted that he was doing well in school with "glowing" teachers' reports and that he was able to engage in the complex task of reconfiguring his transformer toy.  (*Id.*)  Dr. Salomon determined that C.K.C. was cooperative, alert, engaged, though inattentive, but overall, his behavior was deemed unremarkable.  (A.R. 227-29.)  Dr. Salomon recommended pharmacotherapy, behavior therapy, and family therapy.  (A.R. 232.)  Dr. Salomon further explained he was unsure whether an ADHD diagnosis was appropriate and attributed many of C.K.C.'s behaviors to Sensory Processing Disorder ("SPD"), which are behaviors related to processing sensory information.  (A.R. 233.)  While Dr. Salomon found C.K.C. had some criteria for ASD, he recommended further assessment in therapy.  He further noted that he believed C.K.C.'s behavior and emotional issues "may be a reaction to the overwhelm of being on the spectrum and not having his specific needs adequately met." (*Id.*)

On December 20, 2017, C.K.C. saw Dr. Gault for anxiety and ADHD and possible ASD. (A.R. 257.)  The Plaintiff informed Dr. Gault that C.K.C. had headaches four times a week that required him to lay down in a quiet place and avoid light.  (*Id.*)  He was 49.8 inches tall, weighed 48 pounds and 13.4 ounces, and had a BMI of 13.56.  Dr. Gault noted that C.K.C. was well

3

appearing, cooperative with no acute distress, well developed and nourished, and noted no other abnormal observations. Dr. Gault diagnosed him with headache syndrome and ADHD. (A.R. 260.)  C.K.C.'s treatment plan involved Dr. Gault's recommendation to schedule an appointment with YAI for an assessment, referral to neurology, and ongoing evaluation for ADHD, anxiety, and possible ASD.  (*Id.*)

On January 11, 2018, C.K.C returned to Dr. Gault to renew his ADHD medications.  (A.R. 255.)  Dr. Gault's notes remained the same regarding C.K.C.'s constitution and she reported normal EKG results.  (A.R. 257.)  He was 50 inches tall, weighed 48 pounds and 1.6 ounces, and had a BMI of 13.53.

On March 8, 2018, Dr. Bridget Mueller, a pediatric neurologist, saw C.K.C. to evaluate him for his headaches with review by Dr. Hillary Raynes.  (A.R. 252.)  Plaintiff informed Dr. Mueller that C.K.C. was on Topamax and Clonidine for disruptive mood disorder.  (*Id.*)  Plaintiff expressed uncertainty that the Topamax was helping with his mood stabilization but said his headaches had decreased dramatically and that his last headache was 12 days ago.  (*Id.*)  Plaintiff also informed Dr. Mueller that she believed C.K.C.'s social communication and interaction were normal and that he is able to engage in limited back-and-forth conversation. Dr. Mueller observed that C.K.C. was a "well appearing boy" who was awake, alert, shy but socially appropriate with minimal spontaneous verbal output.  (A.R. 254.)  Dr. Mueller's recommended treatment was to continue Topamax and return if migraines worsened, and to continue to follow up with Dr. Brooks at Northside.  (*Id.*)

On October 30, 2018, Dr. Vasiliki Karagiorga and Dr. Trelles-Thorne saw C.K.C. for the same ASD and ADHD symptoms.  (A.R. 378-91.)  Plaintiff reported that C.K.C. was having sleep

4

onset difficulties, had not gained weight in two years, which put him in the 2nd percentile for BMI, and had low appetite for the previous three years.  In an autism mental status exam, the clinicians observed eye contact for greater than 3 seconds, passive responses and interest in others, that he can point or gesture to an object, can speak about other time/context, and no unusual or encompassing preoccupations.  (A.R. 389-90.)  They also saw that he was alert, oriented, calm and cooperative, had no involuntary movements, and had fair insight and impulse control.  (A.R. 390.)  The clinicians continued some of his medications and planned for a neuropsych test and Individualized Education Program ("IEP") on the next visit.  (A.R. 391.)

On December 11, 2018, Dr. Danica Vargo, with Dr. Trelles-Thorne, examined C.K.C. for anxiety and ADHD.  His father described some symptoms that were different from previous medical visits, including that he was sleeping more after school and not his usual alert and hyper self in light of a recent death in the family.  (A.R. 370.)  He also had difficulty falling asleep and completing homework.  His height was 4 feet 1.29 inches and 51 pounds and 6.4 ounces, which was a BMI of 14.87%.  (A.R. 371-72.)

In January 2019, Dr. Katherine Legare, with Dr. Trelles-Thorne, examined C.K.C. for a follow up.  (A.R. 362.)  His parent reported that C.K.C. had ongoing occasional outbursts, issues focusing on homework, frustration, issues with his siblings, and ongoing grief reactions. However, his father also said that C.K.C. was sleeping better with an improved appetite.  Dr. Legare continued his medications.

In February 2019, C.K.C. saw Dr. Myles Schiller, a pediatric cardiologist, for heart palpitations and murmurs, potentially due to a viral illness experienced two to three weeks prior.  (A.R. 319.)  Dr. Schiller found that C.K.C. appeared well, that his physical examination

was unremarkable, and the electrocardiogram findings were unremarkable.  (A.R. 321.)  He was diagnosed with palpitations that were seemingly resolved.

In March 2019, Dr. Vargo, with Dr. Trelles-Thorne, had a follow up with C.K.C. for his anxiety and ADHD.  (A.R. 353.)  His mental status examination was good, and the doctors observed that he was engaged and had intact cognition with fair insight and judgment.  Dr. Vargo increased his Concerta dosage along with a trial taper of the Guanfacine he took for ADHD.  (A.R. 355.)

On April 23, 2019 and May 7, 2019, Dr. Lara Katz and Dr. Trelles-Thorne, examined C.K.C. for anxiety and ADHD.  (A.R. 345-46.)  The doctors did not deviate from their prior observations and renewed his medications.

On June 11, 2019, Dr. Howard Seiden and Dr. Neha Ahluwalia examined C.K.C. for heart palpitations and heart murmur (A.R. 408-410.)  Both doctors found that his previous episode had resolved and observe no heart sounds or murmurs.

On July 2, 2019, C.K.C. returned to Dr. Trelles-Thorne for a follow up appointment. There was no change in the symptoms reported and Dr. Trelles-Thorne continued the claimant on his medications.  (A.R. 340.)

On August 20, 2019, Dr. Billy Zou conducted a follow up exam for ADHD and anxiety. (A.R. 420.)  Dr. Zou indicated that C.K.C. was doing well on his medications and renewed them. Dr. Zou also observed that C.K.C. was well-nourished, had build and status within the normal limits, made appropriate eye contact, was well-related and engaged, and had linear, goal-directed thought processes and content.  (A.R. 420.)  C.K.C. was 4 feet 5 inches, weighed 50 pounds and 6.4 ounces, with a BMI of 12.61.  (A.R. 421.)

On September 4, 2019, Dr. Gault examined the claimant.  At that time, C.K.C. no longer qualified for an IEP, but Plaintiff was seeking extended time for C.K.C. on assignments, preferential seating, limited length of his homework assignments, separate testing locations, frequent breaks, and breakdown of assignments into smaller parts.  (A.R. 461.)  Dr. Gault approved these accommodations for C.K.C.  (A.R. 463.)

Around January 9, 2020, Dr. Allison Gallet reported that C.K.C. had ADHD, Anxiety, and Autism for the purposes of 504 accommodations for the 2019-2020 school year.  Dr. Gallet recommended the same accommodations that Dr. Gault approved in the September 2019 evaluation.  (A.R. 519.)

    *b.  Evaluations*

      i.   Dr. Phillips

After Plaintiff filed the SSI on March 12, 2018, Ruby Phillips, Ph.D., a consultative psychologist, saw C.K.C. on May 6, 2018 on behalf of the SSA.  Plaintiff informed the psychologist that C.K.C. was in regular class but received occupational therapy and special education services.  (A.R. 301.)  Plaintiff further reported that C.K.C. had tantrums lasting an hour, was easily distracted, bit his nails and picked his skin due to anxiety, and had social skill deficit, sensory issues, and repetitive motor movements.  (*Id.*)  A mental status exam showed that C.K.C. had normal posture, normal motor behavior, appropriate eye contact, age appropriate expressive and receptive language, full affect, intact and age-appropriate attention and concentration, intact memory, average cognitive functioning, and fair insight and judgment.  (A.R. 302-03.)  Dr. Phillips's medical source statement stated C.K.C. showed "no evidence of limitation in ability to sustain concentration and complete age-appropriate tasks",

7

"no evidence of limitation in ability to adequately maintain appropriate social behavior", "markedly limited" ability to respond to changes in environment appropriately, mild limitations in ability to learn, no evidence of limitation in ability to ask questions and for assistance in an age-appropriate way, no evidence of limitation in ability to be aware of danger and take precautions as need, mild limitation in ability to interact with peers, and no limitation in ability to interact with adults.  (A.R. 303.)  Dr. Phillips noted the results with the evaluation were consistent with psychiatric problems, which may "significantly interfere with the claimant's ability to function on a daily basis."  (A.R. 304.)  Dr. Phillips did not expand on how C.K.C.'s daily functions were or may be limited.  Dr. Phillips diagnosed C.K.C. with ADHD and DMDD and recommended continuation of the current psychiatric treatment, continuation of the present educational placement, and parent management training.  However, she indicated the prognosis was fair given adequate treatment and educational intervention.  (*Id.*)

> ii.   Dr. Randall

On May 23, 2018, Doctor J. Randall, a state pediatric consultant, reviewed the evidence on record including Dr. Phillips' report and found that claimant's ADHD and migraine impairments were not severe impairments.  (A.R. 76.)  Dr. Randall also noted that there was no limitation on acquiring and using information, no limitation in attending and completing tasks, no limitation on interacting and relating with others, less than marked limitation in moving about and manipulating objects, no limitation in caring for himself, and less than marked limitation in health and physical well-being.  (A.R. 76-77.)

> iii.   Autism Evaluation

8

On May 25, 2018, C.K.C. had an autism evaluation by Dina Larina M.A., under the supervision of Dr. Charles Yurkewicz, for the purposes of diagnostic clarity and service eligibility and not for Court purposes, as a forensic evaluation was not conducted.  (A.R. 309.)  Plaintiff told the clinician that C.K.C. prefers to play by himself, has specific preferences for food and clothing, has difficulties washing his hair, needs to hug and kiss his parents every 10 minutes, and acts out aggressively.  (*Id.*)  Further, his attainment of developmental milestones occurred late, and he did not begin speaking until he was 2.5 years old and did not speak in phrases until 3 years old.  He also had staring spells when he was 2 to 3 years old.  The clinician also looked at his previous evaluation by YAI in January 2018 where the claimant received an IQ score of 95, which is the 37th percentile on the Stanford Binet test.  C.K.C. also scored on the low range of the Vineland Adaptive Behavior Scales.  (A.R. 309-10.)

The clinician evaluated C.K.C. using the Autism Diagnostic Observation Schedule, Second Edition (ADOS-2); the Childhood Autism Rating Scale, Second Edition, High Functioning Version (CARS-2 HF); and a Clinical Interview.  (A.R. 310.)  Under the ADOS-2 test, the examiner found that C.K.C. was chatty, fidgety during some tasks, and utilized relatively complex speech.  (*Id.*)  C.K.C. also showed some pleasure in interacting with the examiner though there was little reciprocal conversation unless the topic was of interest to him.  Results from this test classified C.K.C. with ASD.

Under the CARS-2 HF test, the Plaintiff reported that C.K.C. imitates sounds, words, and movements.  (A.R. 312.)  The Plaintiff also reported C.K.C. talks a lot, shows too much emotion, cries and has outbursts where he throws things and may hit his mother, and needs to be prepared in advance for any upcoming events.  C.K.C. also dislikes loud noises and dislikes being

off the ground or carried.  The CARS-2 exam, based off these reported symptoms, showed he

had Severe Symptoms of ASD.

Larina and Dr. Yurkewicz concluded that C.K.C. met the criteria for autism and that he

should be referred to YAI for Medicaid service coordination, a social skills group, and for a

neurological evaluation to assess the staring spells.

> iv.    Psychoeducational Evaluations

On July 25, 2019, a psychoeducational evaluation report was prepared by Megan

Granski, supervised by Dr. A. Jordan Wright, and compiled after observations on May 7, 2019;

May 14, 2019; May 30, 2019; and June 4, 2019.  (A.R. 502-519.)  The Plaintiff reported

substantially similar difficulties C.K.C. had at home as she previously reported to other

clinicians, though many of the symptoms Plaintiff reported did not appear in C.K.C.'s school

environment or in the clinical setting.  (A.R. 503-04.)  The mental status examination showed

that C.K.C. was cooperative, engaged, and sat still throughout the evaluation.  (A.R. 505-06.)  He

had anxious thoughts but not depressive thoughts.  His memory skills were intact, and speech

was unremarkable.  (*Id.*)

C.K.C. also underwent cognitive testing, which found that his overall functioning was

within the average to high average range.  He had some weaknesses in his attention span, but

medication had helped improve it.  He was also observed to have unimpaired fine motor skills,

average visual perception, good visual motor integration, high average impulse control with the

medication, and average cognitive flexibility.  (A.R. 506-08.)

The psychoeducational report indicated C.K.C. met the criteria for ASD based on his

history, though the evaluation did not assess him for ASD.  (A.R. 511.)  It also found C.K.C. met

10

the criteria for ADHD, though he did not meet the criteria for hyperactive/impulsive ADHD. (A.R. 511-12.) C.K.C. also met the criteria for anxiety but did not meet the criteria for disruptive mood dysregulation disorder ("DMDD"). (A.R. 512.) Recommendations included an educational environment tailored for students with ASD, extra time on exams, breaks every 20 minutes on all standardized tests and in-class exams, individualized assistance from teachers, and various forms of therapy for C.K.C. and his parents. (A.R. 512-14.)

     *c. Educational Records*

On January 19, 2018, C.K.C. was examined in a psychoeducational evaluation by Dr. Howard Stillman, a school psychologist, as part of a three-year re-evaluation. (A.R. 296-99.) Dr. Stillman interviewed C.K.C., conducted a Wechsler Individual Achievement Test, and conducted the Wechsler Intelligence Scale for Children. (A.R. 296.) Dr. Stillman observed that the claimant was friendly, followed instructions, and completed the test with minimal intervention. (A.R. 296.) On the Intelligence Scale, the claimant scored in the extremely high range for processing speed, the high range in the fluid reasoning, verbal comprehension, working memory, and full scale IQ, and the low average range for visual spatial index. (A.R. 299.) On the Individual Achievement Test, C.K.C. had superior spelling and average decoding and math, reading comprehension, math problem solving, and oral expression. (*Id.*) Dr. Stillman reserved final recommendations for an upcoming IEP meeting. (*Id.*)

The IEP Report from March 15, 2018 when C.K.C. was in second grade determined that the claimant had "other health impairment." (A.R. 142.) This IEP found that he was friendly, interacted appropriately, was a quick learner, and completed his assignments in a timely manner. (A.R. 144.) The IEP discussed his strengths including that is a bright student who is

eager to please, is alert and responsible, enjoys school, adheres to class and school rules, and is very smart despite having anxiety. (A.R. 144-145.) He was kept in regular education classes and given occupational therapy once a week to further assist with his fine motor and visual motor skills, which could be discontinued in a year if he continued to improve. (A.R. 145.)

    *d.  The ALJ Hearing*

The June 2019 hearing included testimony from both C.K.C. and Plaintiff, his mother. (A.R. 39-71.) Plaintiff was not represented by counsel. C.K.C. testified that he was in third grade and would be finishing in a week. (A.R. 54-55.) He testified that he enjoyed reading and liked dinosaurs. (*Id.*) He testified that he had a best friend in his class he played with during lunch and recess but that he does not see him outside of school.

Plaintiff testified that C.K.C has a Baker cyst, a fluid-filled growth behind the knee, on his left knee that bothers him if he walks or runs too much. (A.R. 60.) She also testified that his grades go up and down and that schoolwork is hard for him. (*Id.*) Plaintiff further testified that C.K.C. had an IEP done for the prior school year but has not received a new one for the current school year. C.K.C. was receiving occupational therapy services from the school. He also was seeing a cardiologist for a heart murmur, chest palpitations, and shortness of breath. (A.R. 63.) He experienced headaches, was taking Topamax to help with the migraines, and saw a neurologist every three months. (A.R. 64-65.) However, the Topamax was mitigating his headaches effectively so that he only received them once a week instead of daily. (A.R. 65.) He did not experience headaches at school. When he did get a migraine, he had to be in a dark, quiet place laying down with his eyes and face covered and the lights off.

C.K.C. also saw Dr. Trelles-Thorne every month for his ADHD, DMDD, and autism.  (A.R. 66.)  Due to his autism, C.K.C. lined things up, collected dinosaurs and rocks, and was sensitive to changes in his schedule, requiring his parents to give him advance notice of upcoming changes.  (A.R. 67.)  According to Plaintiff, due to his bipolar disorder or DMDD, C.K.C. is moody and angers quickly and twice hurt his younger sister.  (*Id.*)  She stated C.K.C. needs help with brushing his teeth, tying his shoes, and washing his hair because he has difficulty with motor skills.  She stated he was diagnosed with SPD because of his sensory limitations.  (A.R. 68.)  She stated he has gotten into fights twice during school, though the educational records do not reflect this.  (A.R. 69.)  Plaintiff testified that she did not know if her son would advance to fourth grade as he had low grades, particularly in math.  (A.R. 69.)

### 3.  Commissioner's Decision

Applying the framework for child claims, the ALJ found that Plaintiff had severe impairments of ASD, ADHD, and anxiety disorder but that these impairments did not meet or equal the severity of one of the listed impairments in the regulations.  (A.R. 11-13.)  The ALJ also found that C.K.C. had nonsevere impairments, including his Baker's cyst, low BMI, and heart murmur.  He found that C.K.C's limitations were not "functionally equivalent" to a listed impairment because C.K.C. had less than marked limitations in three childhood functional domains and no limitation in the other three domains.  (A.R. 16-27.)  The ALJ concluded that Plaintiff had not shown that C.K.C.'s medical impairments imposed extreme limitations in at least one of these domains, or marked limitations in at least two domains, and therefore, failed to show disability as defined in the Social Security Act.  (A.R. 26.)

The ALJ determined that C.K.C.'s ASD, ADHD, and anxiety did not meet the standards of the relevant listings, Listings 112.06, 112.10, or 112.11.  (A.R. 13.)  In finding that C.K.C. did not meet the so-called "paragraph B" criteria, the ALJ noted that C.K.C.'s limitations were not "extreme" in one or "marked" in two of four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself.  (A.R. 13-14.)  Rather, the ALJ found C.K.C. had a moderate limitation in three of the factors and no limitation in understanding, remembering, or applying information.  (A.R. 14.)

Under the first factor, the ALJ found that C.K.C.'s March 2018 IEP noted he was a quick learner, meticulous with his schoolwork, did well in school, and that he did not qualify for an IEP in September 2019.  (Id.)  Under the second factor, the ALJ found that the autism testing found some limitations in social functioning but that he also maintained appropriate eye contact, showed pleasure in interacting, and that an examination in March 2018 showed socially appropriate behavior.  In his ability to concentrate, the ALJ found C.K.C.'s psychoeducational evaluation from 2019 showed average selective attention and the consultative examiner's findings of goal directed thought processes and average cognitive functioning. Under the fourth factor, the ALJ noted the Plaintiff's testimony that C.K.C. experiences tantrums and mood swings at home but cited the March 2018 IEP's findings that C.K.C. is able to express his thoughts and complete daily living activities and cited the consultative examiner's findings that he can dress, bathe, and groom himself.  The ALJ also found paragraph C criteria for Listing 112.06 were not fulfilled and that Listing 112.14 for developmental disorders in infants and toddlers were not fulfilled.  (A.R. 15.)

14

As for functional equivalence, the ALJ found that C.K.C. had less than marked limitations in three domains: (1) attending and completing tasks; (2) interacting and relating with others; and (3) moving about and manipulating objects.  (A.R. 17.)  The ALJ found that C.K.C. had no limitations in the remaining three: (1) acquiring and using information; (2) caring for himself, and (3) health and physical well-being.  *Id.*

As part of this determination, the ALJ credited the December 14, 2017 exam that C.K.C. was inattentive but otherwise had normal findings, including clean grooming, good eye contact, cooperative behavior, and fair insight.  (A.R. 18.)  He also discussed the February 6, 2018 report at Northside Center which found C.K.C. was focused on his Transformer toy, was able to sit still and concentrate on the task, and was engaged.  (*Id.*)  The ALJ also discussed the mixed results from the May 2018 autism evaluation and the mental status exams from October 2018 to December 2018 that had "mostly normal findings".  (A.R. 19-20.)  The ALJ also discussed reports from 2019 that said C.K.C. was mostly doing well in school, and the May to June 2019 psychoeducational evaluation that found that C.K.C. had unimpaired fine motor skills, average visual perception and nonverbal reasoning, high average impulse control on medication, and average cognitive flexibility.  (A.R. 21.)

The ALJ found that the Plaintiff's testimony about her son was inconsistent with C.K.C.'s testimony, test scores that showed average to above average functioning, the 2018 IEP, the fact that he no longer qualifies for an IEP, his continuing success in school, and the mental status exams with normal findings.  (A.R. 26.)  The ALJ found that the record showed that the C.K.C. had greater functional abilities than his mother noted and did not support a finding that his impairments caused a marked limitation in any domain.  (*Id.*)

**DISCUSSION**

1. **Legal Standard**

Any "final decision" of the Commissioner is subject to judicial review.  42 U.S.C. § 405(g).

A court's review of a Social Security disability determination requires two distinct inquiries.

First, the court must determine whether the Commissioner applied the correct legal principles

in reaching a decision.  *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  Second, the court

must decide whether the Commissioner's decision is supported by substantial evidence in the

record.  *Id.*  If the Commissioner's decision is supported by substantial evidence, the ALJ's

findings as to any facts are conclusive.  42 U.S.C. § 405(g).

a. *Development of the Record*

An ALJ has an affirmative duty to develop the record on behalf of claimants.  *See*

*DeGraff v. Comm'n of Social Security*, 850 F. App'x 130 (2d Cir. 2021); *Moran v. Astrue*, 569 F.3d

108, 112-13 (2d Cir. 2009); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This duty exists

because social security proceedings are essentially non-adversarial.  20 C.F.R. § 404.900(b);

*Shafer v. Colvin*, 2018 WL 4233812, at *7 (S.D.N.Y. Feb. 15, 2018) *report and recommendation*

*adopted*, 2018 WL 4232914 (S.D.N.Y. Sept. 4, 2018)).  A remand by the court for further

proceedings is appropriate when the Commissioner has failed to provide a full and fair hearing,

to make explicit findings, to appropriately develop the record, or to have correctly applied the

regulations.  *Ming v. Astrue*, 2009 WL 2495947, at *3 (E.D.N.Y. Aug. 13, 2009); *Donnelly v.*

*Colvin*, 2015 WL 1499227, at *8 (S.D.N.Y. Mar. 31, 2015).

The Second Circuit has outlined a heightened duty an ALJ bears in the case of *pro se*

claimants to ensure that the claimant has had "a full hearing under the Secretary's regulations

16

and in accordance with the beneficent purposes of the Act." *Gold v. Secretary of HEW*, 463

F.2d 38, 43 (2d Cir. 1972). Where, as here, the claimant was unrepresented by counsel at the

administrative hearing, the ALJ is under a heightened duty "'to scrupulously and

conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Hankerson v.*

*Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold*, 463 F.2d at 43). A reviewing court must

determine whether the ALJ "adequately protect[ed] the rights of [a] *pro se* litigant by ensuring

that all of the relevant facts were sufficiently developed and considered." *Id.* "Rather than

gather every conceivable medical record during the relevant period, therefore, the ALJ must

obtain additional information . . . when the evidence as a whole is not complete enough for the

ALJ to make a determination." *Clarke v. Comm'r of Soc. Sec.*, 2021 WL 2481909, at *13

(S.D.N.Y. 2021) (internal quotation marks omitted). Nonetheless, the ALJ's duty to develop the

record is "doubly heightened" where the claimant both is unrepresented and alleges mental

illness. *See Maldonado v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 183, 193 (S.D.N.Y. 2021).

   b.  *Standard for Assessing Eligibility for Benefits for Children*

        To assess whether a child claimant qualifies for SSI, the ALJ must conduct a three-step

sequential inquiry. *See Pollard v. Halter*, 377 F. 3d 183, 189 (2d Cir. 2004). If it is determined

that a claimant is not disabled at any step in the evaluation process, the ALJ does not continue

to the next step. At step one, the ALJ must find that the claimant is not engaged in any

"substantial gainful activity." 20 C.F.R. § 416.924(a). At step two, the ALJ must determine

whether the child has a medically determinable severe impairment, i.e., an impairment or

combination of impairments "that causes . . . more than minimum functional limitations." *Id.* §

416.924(c). Finally, at the third step, the ALJ must assess whether the child has an impairment

or combination of impairments that meets, medically equals, or functionally equals one of the impairments in the "Listings." *Id.* § 416.924(d). (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings"). To medically equal a listed impairment, the medical findings must "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. 416.926(a). If a child has an impairment that is not described in the Listing, the ALJ will "compare [the] findings with those for closely analogous listed impairments." 20 C.F.R. 416.926(b)(2). If the findings are at least of equal medical equivalent, then the ALJ will find the impairment is medically equivalent to the analogous listing. *Id.*

If a child claimant's impairments do not meet or medically equal any of the Listings, the ALJ must then determine whether they functionally equal a Listing. *Pollard*, 377 F. 3d at 189. To functionally equal a Listing, the ALJ must find that the severe impairment(s) at issue results either in "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one of the six domains of functioning. 20 C.F.R. § 416.926a(a). The six domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). Limitations are "marked" when the impairment(s) "interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation "is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* Limitations are "extreme" when the impairment(s) "interferes very seriously with your ability to independently initiate, sustain, or complete activities" and is "more than 'marked." 20 C.F.R. §

18

416.926(e)(3)(i).  "It is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

### 2. Analysis

Here, the ALJ's decision was supported by substantial evidence, and he did not err in not requesting a medical source statement from C.K.C.'s treating physician and a functional assessment from his teacher.  The ALJ also did not err in construing the evidence and in his analysis of medical equivalence.

### i. *Development of Record*

Plaintiff asserts that the ALJ failed to fully develop the record because he should have requested medical source statements from C.K.C.'s treating physicians, Dr. Gault and Dr. Trelles-Thorne.  Generally, the ALJ must develop a complete medical history for at least the twelve months preceding an application for benefits.  42 U.S.C. § 423(d)(5)(B).  Further, the Commissioner must make every reasonable effort to obtain medical evidence, including diagnostic tests, from the claimant's treating physician that are necessary to make a determination before turning to consultative sources.  *Id.*

The ALJ requested medical records from Mount Sinai and Northside Center and his scholastic records on March 23, 2018 and April 6, 2018 in addition to a medical opinion from Dr. Phillips, a consultative source.  (A.R. 73-74.)  He also requested medical records and treatment records from Dr. Trelles-Thorne and Dr. Gault, C.K.C.'s treating doctors.  After the hearing, the ALJ received records from YAI Center for Special Therapy, C.K.C.'s school, Montefiore, Dr. Trelles-Thorne, Dr. Seiden, Dr. Gault, and additional records from Mount Sinai.

19

In total, the records span the time period from October 2017 to January 2020 with no obvious gaps.

Plaintiff suggests that the absence of the medical source opinions from Dr. Gault and Dr. Trelles-Thorne and a functional assessment from the claimant's schoolteacher requires a remand.  However, remand is generally not required when an ALJ fails his duty to request opinions where the record contains sufficient evidence to allow an ALJ to assess the claimant's limitations.  *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (finding a medical record was extensive and did not require a remand where it did not contain the treating physician's formal opinion on the claimant's residual functional capacity but had an assessment of limitations from the treating physician).  In this case, the record contained years of treatment records, all of which were largely consistent regarding C.K.C.'s functioning.  This is sufficient.  *See Arboleda v. Colvin*, 2014 WL 5786948, at *3 (S.D.N.Y. Nov. 6, 2014) (finding the ALJ's failure to request a medical opinion from a child claimant's treating physician did not require a remand where the record was extensive); *Contreras v. Comm'r of Soc. Sec.*, 2014 WL 5149111, at *13 (S.D.N.Y. Oct. 14, 2014) (finding the administrative record was sufficient for the ALJ to determine a child claimant was not disabled where the record did not show significant conflicts in the medical evidence); *Pellam v. Astrue*, 508 F.App'x 87, 90 (2d Cir. 2013) (finding that the ALJ's failure to request a medical opinion from the claimant's treating physician did not require a remand where the ALJ had the treating physicians' treatment notes).

Similarly, Plaintiff's assertion that the ALJ should have requested a functional assessment from the school does not require a remand here when the ALJ had before him and

considered C.K.C.'s IEPs and school record.  These records showed that C.K.C. was largely successful in school, in a regular class, needing only OT for fine motor skills.  By 2019, the record indicates that the school had determined C.K.C no longer needed an IEP, though his mother was seeking certain accommodations due to his ADHD and ASD.  In sum, the school records were sufficient to allow the ALJ to make a finding as to C.K.C.'s limitations and functioning.  *See, e.g.*, *Clarke*, 2021 WL 2481909 (finding that the ALJ is not obligated to gather every possible piece of information, but only what is sufficient to make a finding).

Notably, the Plaintiff does not describe how the opinions from Drs. Gault or Trellis-Thorne or a functional assessment from the school would have assisted the ALJ or state that they would have contained information different from that already possessed by the ALJ that would support a finding of disability.  Absent an explanation of how these assessments or opinions would have affected the outcome, the Court finds no error in the ALJ's development of the record.  *Reices-Colon v. Astrue*, 523 Fed. Appx. 796 (2d Cir. 2013); see also *Santiago v. Astrue*, 2011 WL 4460206, *2 (D. Conn. Sept. 27, 2011) (issue in determining failure to develop the record is whether missing information is significant).

*ii.  Substantial Evidence Supports the ALJ's Decision*

Next, Plaintiff argues that the ALJ's decision is not supported by substantial evidence and argues the ALJ cherry-picked evidence.  Plaintiff points to the fact that Dr. Gault stated that C.K.C. should be given certain accommodations at school such as breaks and additional time and that the NYU Steinhardt Neuropsychological report noted Plaintiff's mother reported that C.K.C. fought with his brother, was content to play by himself, played with rocks and dinosaurs, had difficulty responding to change and with loud noises and had temper tantrums at times.

21

Plaintiff also points to testing showing C.K.C.'s attention deficit.  These arguments, however, are in reality disagreements with how the ALJ weighed the evidence as a whole.  An ALJ is permitted to evaluate the evidence and make a finding consistent with the record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

Plaintiff argues that the ALJ improperly construed the evidence by finding that the claimant "had no marked limitations in any of the six functional domains relevant to functional equivalence based on a March 2018 Individualized Educational Plan and Ms. Torres' report that the school had concluded to terminate her son's IEP services." (*Joint Stipulation* 29, ECF No. 26.)  However, in evaluating whether the claimant met any impairments in the Listings, the ALJ references not only the claimant's ineligibility for IEP in finding that the claimant did not have a limitation in understanding, remembering, or applying information but also the claimant's good performance in school, including making the Honor Roll, his intelligence test results, his placement in regular classes, and his academic test results.  (A.R. 14.)  Further, in evaluating the six domains of functioning, the ALJ only briefly discussed the fact that the claimant is no longer eligible for IEP while also considering the various evaluations from almost all of the providers that reported mostly normal findings and certainly not any extreme limitation nor marked limitations in two or more functional domains.[1]  (A.R. 18.)   More importantly, Plaintiff points to no evidence that suggests C.K.C. has an extreme limitation in any functional domain or a marked limitation in two or more domains.

---

[1] While it is true that Dr. Phillips found a marked limitation in C.K.C.'s ability to respond appropriately to changes in the environment, the ALJ found this not persuasive because it was seemingly based on C.K.C.'s mother's description and not on the examiner's own observations and was inconsistent with the record, including C.K.C.'s cooperative behavior in school and pleasant attitude reported by Dr. Phillips and other examiners.  In any event, Dr. Phillips did not find marked limitations in any other functional domain.

Plaintiff's argument that the ALJ should have considered her active dispute with the school's conclusion that C.K.C. no longer qualified for IEP and Dr. Gault's 504 statement, substantiating his need for ongoing support services and accommodations, is unpersuasive. (*Joint Stipulation* 30, ECF No. 26.)  Neither of these facts are contradictory to the ALJ's finding. The ALJ's findings were that C.K.C. has severe impairments of ASD, ADHD, and anxiety but did not exhibit marked limitations due to those impairments—these findings do not mean that C.K.C. should not have certain accommodations or an IEP.  The ALJ made an assessment based on the standards under the Social Security Act, not under the laws pertaining to accommodations in school and individual education plans.  Further and in any event, Dr. Gault's treatment notes are *consistent* with the ALJ's finding that the claimant's limitations are *not severe*, including Dr. Gault's notes that the claimant is "well appearing, active, cooperative". (A.R. 255, 258, 262, 463).

Plaintiff argues that the ALJ ignored the NYU Steinhardt Neuropsychological report, which supported a finding that C.K.C. had impaired attention and concentration, particularly when not medicated.  (*Joint Stipulation* 31, ECF No. 26).  However, the failure "to cite specific evidence does not indicate that such evidence was not considered."  *Martinez o/b/o M.G. v. Comm'r of Soc. Sec.*, 2017 WL 9538863, at *11 (S.D.N.Y. Aug. 25, 2017), *report and recommendation adopted Martinez v. Comm'r of Soc. Sec.*, 2017 WL 4232578 (S.D.N.Y. Sept. 22, 2017) (citing *Brault v. Soc. Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012)).  Further, contrary to Plaintiff's assertion that this report was not acknowledged in the ALJ report, the ALJ finding discusses that the report noted weak sustained attention without medication but average

selective attention with the medications.  (A.R. 23.)  In other words, the ALJ did consider the report when considering the totality of information about C.K.C.

The ALJ's finding is supported by claimant's success academically, reported fair impulse control, and Dr. Phillips' report that stated C.K.C.'s attention and concentration was "intact and age appropriate".  (A.R. 303.)  It is also supported by records from Dr. Randall and Dr. Stillman who also did not observe limitations in completing tasks or following instructions.  (A.R. 76, 296.)  It is similarly supported by records from the Northside Center for Child Development where notes indicate C.K.C. was focused on reconfiguring a transformer toy and absorbed in the task for the majority of the intake period.  (A.R. 220-23.)  In sum, the evidence as a whole is inconsistent with a finding that C.K.C. has a marked limitation in his ability to "independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *Brown v. Comm'r of Soc. Sec.*, 2016 WL 3039892, at *17 (S.D.N.Y. May 27, 2016) (finding the ALJ's conclusion that the child claimant had a less than marked limitation in the domain of attending and completing tasks was supported by substantial evidence where the record showed the child claimant had increased ability to focus and maintain attention with the assistance of medication).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must affirm the Commissioner if supported by substantial evidence even if substantial evidence may also support the plaintiff's position.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).   For the reasons stated above, the ALJ's decision is supported by substantial evidence and thus must be affirmed.  *See Traci R. o/b/o/ E.A.O.B. v. Comm'r of Soc. Sec.*, 2022 WL 4354367 (N.D.N.Y. Sept. 20, 2022) (in case of child with ASD, finding denial of benefits supported by substantial evidence even

though record showed child had some limitations in functioning); *Alicia R., on behalf of DA v. Comm'r of Soc. Sec.*, 2019 WL 4054007 (N.D.N.Y. Aug. 28, 2019) (in case of child with ASD and hyperactivity, finding denial of benefits supported by substantial evidence even though child had marked limitation one of six functional domains).

### iii. Medical Equivalence

Plaintiff's argument that the ALJ erred in failing to address the medical equivalency of being underweight to Listing 105.08 for a Growth Disorder due to a Digestive Disorder is without merit.   In order to meet medical equivalency of a listed impairment, a plaintiff must present medical findings that equal the severity of all of the criteria for the listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. 416.926(a)).  For a Growth Defect, Plaintiff was required to demonstrate not only that the BMI was less than the third percentile on Table III, but also that the claimant had an impairment equivalent to a chronic nutritional deficiency documented by Anemia with hemoglobin less than 10.0 g/dL or serum albumin of 3.0 g/dL or less.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 105.08.

The ALJ found that the claimant's low BMI was a nonsevere impairment, and the record supports this conclusion.  The ALJ discussed that examinations of C.K.C. found that despite his low BMI, he had normal respiratory, cardiovascular, back, extremity, and neurological findings. (A.R. 12.)  The ALJ also referenced treatment notes from claimant's March 2018 visit to Dr. Mueller where the claimant had a low BMI, but the clinician described him as "well appearing" and found normal muscle strength, normal reflexes, and normal coordination and gait.  (A.R. 13, 254.)  There is substantial evidence to support this finding as numerous clinicians observed C.K.C.'s low BMI and did not treat this impairment, with the exception of recommending

Pediasure, an over the counter, non-medical nutrition drink and protein shake commonly given to children to supplement their diets.  Dr. Gault examined the claimant on numerous occasions where he had a low BMI but still saw that he was well developed and nourished, well appearing, and had otherwise normal physical findings.  (A.R. 257, 259, 261.)  His other treating physician, Dr. Trelles-Thorne, also observed the claimant on numerous occasions to appear well-nourished with a build and stature "within normal limits".  (A.R. 340, 347, 354, 362, 371.)

Therefore, the ALJ did not err in finding that C.K.C. did not have a growth disorder.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED

and Defendant's cross-motion is GRANTED.

**SO ORDERED.**

Dated:          December 30, 2022
                New York, New York

_____
                              KATHARINE H. PARKER
                              United States Magistrate Judge

27